UNITED STATES DISTRICT COURT
FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

DOUGLAS A. OLDENBURGH,           :
                                 :
          Plaintiff              :     No. 1:08-CV-1671
                                 :
     vs.                         :     (Complaint Filed 9/8/08)
                                 :
MICHAEL J. ASTRUE,               :
COMMISSIONER OF SOCIAL           :     (Judge Muir)
SECURITY,                        :
                                 :
          Defendant              :

## ORDER
March 26, 2009

THE BACKGROUND OF THIS ORDER IS AS FOLLOWS:

The above-captioned action is one seeking review of a

decision of the Commissioner of Social Security ("Commissioner")

denying Plaintiff Douglas A. Oldenburgh's applications for social

security disability insurance benefits and supplemental security

income benefits.

Disability insurance benefits are paid to an individual

if that individual is disabled and "insured," that is, the

individual has worked long enough and paid social security taxes.

The last date that a claimant meets the requirements of being

insured is commonly referred to as the "date last insured."  It is

undisputed that Oldenburg's insured status expired on September

30, 2003.  In order to establish entitlement to disability

insurance benefits Oldenburg must establish that he was disabled

on or before that date.  42 U.S.C. § 423(a)(1)(A), (c)(1)(B); 20

C.F.R. §404.131(a)(2008); see Matullo v. Bowen, 926 F.2d 240, 244

(3d Cir. 1990). Supplemental security income is a federal income supplement program funded by general tax revenues (not social security taxes).  It is designed to help aged, blind and disabled individuals who have little or no income.  Insured status is irrelevant in determining a claimant's eligibility for supplemental security income benefits.

Oldenburgh, who was born on September 1, 1953, claims that he became disabled on July 31, 2001, because of heart problems, diabetes, arthritis, back problems, and a left shoulder injury.  Tr. 153.[1]   At the time of the onset of his alleged disability, Oldenburgh had been employed as a computer technician for Client Logic Corporation, which had a corporate address of 699 Hertel Avenue, Buffalo, New York. Tr. 110 and 130-131. Oldenburgh "took calls from customers" who had "computer problems [and] helped them solve the problem[s]."  Tr. 131.  Furthermore, he "[a]nswere[d] tech questions about internet access" and "operated a windows based computer and phone equipment."  Tr. 123.  It is not clear in which state Oldenburgh was residing at the time he worked for Client Logic Corporation.  He at one point resided in New Mexico but as of September 21, 2001, he had a mailing address of Union City, Tennessee.  Tr. 91.  Oldenburgh also had prior employment as a delivery driver, sports official, real estate sales person, insurance salesman, concrete delivery driver, and a

---

1.  References to "Tr.___" are to pages of the administrative record filed by the Defendant as part of his Answer on November 13, 2008.

supervisor at an automobile body repair shop.  Tr. 114, 130-137 and 204-211.

On September 24, 2003, Oldenburgh protectively filed applications for disability insurance benefits and supplemental security income benefits.  Tr. 15 and 64-67.[2]  After his claims were denied initially and after his motion for reconsideration was denied, a hearing was held on March 2, 2006, before an administrative law judge.  Tr. 31-39 and 740-809.   On April 19, 2006, the administrative law judge issued a decision denying Oldenburgh's applications for benefits. Tr. 15-22.  On June 20, 2006, Oldenburgh filed a request for review of the decision with the Appeals Council of the Social Security Administration.  Tr. 9-11.  On July 7, 2008, the Appeals Council concluded that there was no basis upon which to grant Oldenburgh's request for review. Tr. 6-8.  Thus, the administrative law judge's decision stood as the final decision of the Commissioner.

On September 8, 2008, Oldenburgh filed a complaint in this court requesting that we reverse the decision of the Commissioner denying him disability benefits.  On the same day the

---

2.  Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits.  A protective filing date allows an individual to have an earlier application date than the date the application is actually signed.  Oldenburgh's application for DIB was signed on October 22, 2003.  Tr. 67. Although we scoured the administrative record, we were unable to locate Oldenburg's application for SSI benefits.

Clerk of Court assigned responsibility for this case to the undersigned judge for disposition.

On November 13, 2008, the Commissioner filed a 7-page answer to the complaint and a copy of the administrative record consisting of 804 pages.  On February 2, 2009, Oldenburgh filed his brief and on March 6, 2009, the Commissioner filed his brief. The appeal[3] became ripe for disposition on March 13, 2009, when Oldenburgh filed a reply brief.

Because of the administrative law judge's failure, *inter alia*, to comply with Social Security Ruling 82-41 which failure we will discuss below, this case will be remanded to the Commissioner for further proceedings.[4]

When considering a social security appeal, we have plenary review of all legal issues decided by the Commissioner. See <u>Poulos v. Commissioner of Social Security</u>, 474 F.3d 88, 91 (3d Cir. 2007); <u>Schaudeck v. Commissioner of Social Sec. Admin.</u>,  181

---

3.  Under the Local Rules of Court "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal."  M.D.Pa. Local Rule 83.40.1.

4.  We have thoroughly reviewed the administrative record in this case. The administrative record in this case was very difficult to review because of the fact that many pages of medical records were out of order (e.g., a medical record dated January 23, 2002, from Hillview Medical Center has the first page starting on page 641 of the administrative record and the second page is on page 630 of the administrative record).  In this order, we will only comment on medical and psychiatric evidence that is relevant to our disposition of this case.  The legal errors discussed in this order require that the case be remanded for further proceedings.

F.3d 429, 431 (3d Cir. 1999); <u>Krysztoforski v. Chater</u>, 55 F.3d 857, 858 (3d Cir. 1995). However, our review of the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those findings are supported by "substantial evidence." <u>Id.</u>; <u>Brown v. Bowen</u>, 845 F.2d 1211, 1213 (3d Cir. 1988); <u>Mason v. Shalala</u>, 994 F.2d 1058, 1064 (3d Cir. 1993). Factual findings which are supported by substantial evidence must be upheld. 42 U.S.C. §405(g); <u>Fargnoli v. Massanari</u>, 247 F.3d 34, 38 (3d Cir. 2001)("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); <u>Cotter v. Harris</u>, 642 F.2d 700, 704 (3d Cir. 1981)("Findings of fact by the Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence."); <u>Keefe v. Shalala</u>, 71 F.3d 1060, 1062 (2d Cir. 1995); <u>Mastro v. Apfel</u>, 270 F.3d 171, 176 (4th Cir. 2001); <u>Martin v. Sullivan</u>, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" <u>Pierce v. Underwood</u>, 487 U.S. 552, 565 (1988)(quoting <u>Consolidated Edison Co. v. N.L.R.B.</u>, 305 U.S. 197, 229 (1938)); <u>Johnson v. Commissioner of Social Security</u>, 529 F.3d 198, 200 (3d Cir. 2008); <u>Hartranft v. Apfel</u>, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence has been described as more

5

than a mere scintilla of evidence but less than a preponderance. Brown, 845 F.2d at 1213.  In an adequately developed factual record substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971).  A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence.  Mason, 994 F.2d at 1064.  The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Johnson, 529 F.3d at 203; Cotter, 642 F.2d at 706-707.  Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole.  Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981); Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir. 1979).

Another critical requirement is that the Commissioner adequately develop the record. Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000)("The ALJ has an obligation to develop the record in light of the non-adversarial nature of benefits proceedings,

6

regardless of whether the claimant is represented by counsel."); Rutherford v. Barnhart, 399 F.3d 546, 557 (3d Cir. 2005); Fraction v. Bowen, 787 F.2d 451, 454 (8th Cir. 1986); Reed v. Massanari, 270 F.3d 838, 841 (9th Cir. 2001); Smith v. Apfel, 231 F.3d 433. 437 (7th Cir. 2000);  see also Sims v. Apfel, 530 U.S. 103, 120 S.Ct. 2080, 2085 (2000)("It is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits[.]").  If the record is not adequately developed, remand for further proceedings is appropriate.  Id.

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 432(d)(1)(A). Furthermore,

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.  For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner utilizes a five-step process in evaluating disability insurance claims.  See 20 C.F.R. §404.1520 and 20 C.F.R. § 416.920; Poulos, 474 F.3d at 91-92.  This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity,[5] (2) has an impairment that is severe or a combination of impairments that is severe,[6] (3) has an impairment or combination of impairments that meets or equals the requirements of a listed impairment,[7] (4) has the residual functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy. Id.  As part of step four the administrative

-------

5.  If the claimant is engaging in substantial gainful activity, the claimant is not disabled and the sequential evaluation proceeds no further. Substantial gainful activity is work that "involves doing significant and productive physical or mental duties" and "is done (or intended) for pay or profit."  20 C.F.R. § 404.1510.

6.   The determination of whether a claimant has any severe impairments, at step two of the sequential evaluation process, is a threshold test. 20 C.F.R. §§ 404.1520(c) and 416.920(c). If a claimant has no impairment or combination of impairments which significantly limit the claimant's physical or mental abilities to perform basic work activities, the claimant is "not disabled" and the evaluation process ends at step two.  Id.  If a claimant has any severe impairments, the evaluation process continues.  20 C.F.R. §§ 404.1520(d)-(g). Furthermore, all medically determinable impairments, severe and non-severe, are considered in the subsequent steps of the sequential evaluation process.  20 C.F.R. §§ 404. 1523 and 404.1545(a)(2).

7.  If the claimant has an impairment or combination of impairments that meets or equals a listed impairment, the claimant is disabled.  If not, the sequential evaluation process proceeds to the next step.

8

law judge must determine the claimant's residual functional
capacity. Id.[8]

Residual functional capacity is the individual's maximum
remaining ability to do sustained work activities in an ordinary
work setting on a regular and continuing basis. See Social
Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996). The
residual functional capacity assessment must include a discussion
of the individual's abilities. Id; 20 C.F.R. § 404.1545;
Hartranft, 181 F.3d at 359 n.1 ("'Residual functional capacity' is
defined as that which an individual is still able to do despite
the limitations caused by his or her impairment(s).").

Also, under certain circumstances at step five of the
sequential evaluation process the administrative law judge must
address the issue of transferability of job skills. Jobs are
classified as skilled, semiskilled and unskilled. A job is
unskilled if it has a Specific Vocational Preparation (SVP) level
of 2 or less. The SVP as defined in the Dictionary of Occupational
Titles ("DOT"), a vocational resource published by the United
States Department of Labor and used by the Commissioner as the
primary source of reliable job information, is "the amount of
lapsed time required by a typical worker to learn the techniques,
acquire the information, and develop the facility needed for

---

8.  If the claimant has the residual functional capacity to do
his or her past relevant work, the claimant is not disabled.

average performance in a specific job-worker situation."  DOT, App. C.

To perform a job that is classified as SVP 3 and above, the individual must have the necessary skills to do so.  An administrative law judge cannot assume that a person whose past relevant work was skilled can perform any other skilled or semiskilled work having a lower SVP level. See Podedworny v. Harris, 745 F.2d 210, 219-221 (3d Cir. 1984).

Social Security Ruling 82-41 outlines an administrative law judge's duty when dealing with skills and their possible transferability to other jobs.  Under that ruling "skill" is defined in relevant part as

> knowledge of a work activity which requires the
> exercise of significant judgment that goes beyond the
> carrying out of simple job duties and is acquired
> through the performance of an occupation which is above
> the unskilled level (requires more than 30 days to
> learn). It is practical and familiar knowledge of the
> principles and processes of an art, science or trade,
> combined with the ability to apply them in practice in a
> proper and approved manner.  This includes activities
> like making precise measurements, reading blueprints,
> and setting up and operating complex machinery.  A skill
> gives a person a special advantage over unskilled
> workers in the labor market.
>
> Skills are not gained by doing unskilled jobs, and a
> person has no special advantage if he or she is skilled
> or semiskilled but can qualify only for an unskilled
> job because his or her skills cannot be used to any
> significant degree in other jobs.

"Transferability" under the ruling "means applying work skills which a person has demonstrated in vocationally relevant past jobs to meet the requirements of other skilled or semiskilled jobs."

The ruling provides that transferability of skills is an issue where an individuals's impairments prevent the performance of past relevant work and that work has been determined to be skilled or semiskilled.

SSR 82-41 also requires the administrative law judge to make specific findings of fact when transferability of job skills is an issue, including identifying the acquired work skills and the specific occupations to which the acquired work skills are transferable.

In this case the administrative law judge at step one found that Oldenburg had not engaged in substantial gainful activity "at any time relevant to [the administrative law judge's] decision."   Tr. 17.

At step two, the administrative law judge found that Oldenburgh suffered from the following severe medically determinable impairments: ischemic heart disease, diabetes mellitus, the residuals of a left shoulder fracture, an affective disorder, and obesity. Tr. 17.   The affective disorder according to the administrative law judge was depression.   Tr. 18.

At step three, the administrative law judge found that Oldenburgh's impairments did not individually or in combination meet or equal a listed impairment. Tr. 18.

At step four, the administrative law judge found that Oldenburgh had the residual functional capacity to perform a limited range of semiskilled, light work, up to a level of SVP 4,

but that he could not perform his past relevant work, including his works as a delivery driver, computer technician, teachers' assistant and body shop supervisor, because those jobs required Oldenburgh "to stand and/or walk for more than two hours per day, and/or involved tasks that are too complex, given Mr. Oldenburgh's residual functional capacity."  Tr. 19-20.[9]

---

9.  Sedentary, light and medium work are described at 20 C.F.R. § 404.1567 as follows:

> (a) *Sedentary work*. Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

> (b) *Light work*.  Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

> (c) *Medium work*. Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, we determine that he or she can also do sedentary and light work.

The administrative law judge in his decision specifically stated as follows:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to lift and carry 20 pounds occasionally and ten pounds frequently; stand and/or walk for 30 minutes at a time, up to a total of two hours in an eight-hour work day; sit for one hour at a time, up to a total of six hours in a work day; use foot controls occasionally; balance, stoop, kneel, crouch, crawl, and climb ramps and stairs occasionally; and push and pull ten pounds occasionally.  The claimant cannot climb ropes or ladders, or reach overhead with his left arm.  He should avoid temperature extremes, dust, fumes, humidity, vibration, and hazards such as unprotected heights and uneven walking surfaces.  He requires access to a bathroom due to increased frequency of urination caused by medication.  He can interact occasionally with coworkers, supervisors, and the public, and adapt to occasional changes in the workplace.  He has the mental capacity to work, at a goal oriented, as opposed to production line, rate, and to perform semiskilled work up to a specific vocational preparation (SVP) level of four.

Tr. 19.

During the hearing on March 2, 2006, the administrative law judge took testimony from a vocational expert to determine whether or not jobs exist in the national economy for an individual of Oldenburgh's age, education, work experience and residual functional capacity.  The vocational expert testified that Oldenburgh could not perform his past work, including working as a computer technician which had an SVP of 6, but could perform the sedentary job of telephone answering service employee which has an SVP of 3, the sedentary job of maintenance service dispatcher which has an SVP of 3, the sedentary job of repair order clerk which has a SVP of 3, and the light job of computer

peripheral operator which has a SVP of 4, and that there were
significant numbers of such jobs in the regional and national
economies. Tr. 21 and 369.  At step five, the administrative law
judge concluded that Oldenburgh was not disabled because he could
perform the jobs identified by the vocational expert and that such
job exists in significant numbers in the regional and national
economies.  Tr. 21-22.

        The vocational expert did not testify regarding the
skills Oldenburgh obtained from his past work or explain how he
gained a competitive advantage by being able to transfer them to
other work. The administrative law judge in one sentence found
that transferability of job skills was not material. Tr. 21.  As
argued by Oldenburgh in his brief, this was a clearly erroneous
conclusion by the administrative law judge.  The administrative
law judge had an obligation to comply with SSR 82-41.  The
vocational expert testified and the administrative law judge found
that Oldenburgh had past work that was at least semiskilled and
Oldenburgh was unable to perform his past relevant work.  Thus,
transferability of job skills was material under SSR 82-41.

        The administrative law judge could not rely on the fact
that Oldenburgh had performed work that required skill in the past
to avoid the requirement under SSR 82-41 to make specific findings
of fact.  As one court has stated "[n]either an occupational
titled by itself nor a skeleton description [of a job] is
sufficient" to document a claimant's acquisition of skills.

Dikeman v. Halter, 245 F.3d 1182, 1185 (10th Cir. 2001); Plyes v.
Bowen, 849 F.2d 846, 848 (4th Cir. 1988).  To find a claimant
capable of performing a semiskilled job that the claimant had not
performed previously, an administrative law judge must find that
the claimant has the required skills and that they afford him a
competitive advantage to be able to perform the other semiskilled
job.  Key v. Sullivan, 925 F.2d 1056, 1062-63 (7th Cir. 1991).
Because the administrative law judge did not make a finding of
fact as to the skills Oldenburgh possessed that allowed him to
perform the semiskilled jobs on which the administrative law judge
relied to find Oldenburgh not disabled, the Commissioner's
decision at step five of the sequential evaluation is not
supported by substantial evidence.  This defect relates to both
Oldenburgh's claim for disability insurance benefits and
supplemental security income benefits.[10]

        Oldenburgh also argues that the administrative law judge
failed to evaluate appropriately the mental health evidence.  With
respect to Oldenburgh's claim for disability insurance benefits,
we find no merit to this argument because Oldenburgh had to
establish that he was disabled on or before September 30, 2003,
his date last insured.  There is no medical evidence indicating
that Oldenburgh was totally disabled because of a physical or

_____

10.  Oldenburgh also makes the argument that the Commissioner did
not comply with Social Security Ruling 00-4p.  Because we are
remanding in light of failure to comply with SSR 82-41, on remand
the Commissioner can clarify the application of SSR 00-4p which
also relates to step 5 of the sequential evaluation process.

mental disability existing on or prior to September 30, 2003.[11]
The reason this matter is being remanded with respect Oldenburgh's
claim for disability insurance benefits (DIB) is because the
Commissioner did not fulfill his duty at step 5 of the sequential
evaluation process.[12]

We are, however, not satisfied that the administrative
law judge appropriately evaluated the mental health evidence post-
dating September 30, 2003.  As noted earlier in this order,
insured status is irrelevant in determining a claimant's
eligibility for supplemental security income benefits.

The last psychiatric review form completed by a state
agency consultant for the Social Security Administration contained
in the administrative record is dated August 10, 2004.  That
consultant found based on a review of the written record that
Oldenburgh was suffering from mild depression and that he only had
mild difficulties in maintaining social functioning and mild

---

11.  No medical doctor has indicated that Oldenburg was totally
disabled on or prior to September 30, 2003, for the requisite
time period under the Social Security Act. One mental health
worker, Katherine Page, a Certified Social Worker, has given an
opinion that he was mentally disabled from performing any work
since 1994. Tr. 723-728   Ms. Page's opinion is suspect because
Oldenburg engaged in substantial gainful activity in at least
1994, 2000 and 2001, and there is no evidence that Ms. Page had
contact with Oldenburgh prior to December 15, 2004.  Tr. 107 and
723-728.

12.  In order to make our intent clear we will emphasize that
with respect to Oldenburgh's claim for disability insurance
benefits this is a limited remand solely related to step 5 of the
sequential evaluation process.

difficulties in maintaining concentration, persistence or pace.
Tr. 249 and 256.

Oldenburgh received mental health treatment from several
providers after his date last insured.  He began seeking treatment
at Community Health and Counseling Services located in Maine[13] on
or about October 18, 2004.  Tr. 683.  Oldenburgh sought help for
depression, anxiety, and suicidal ideation caused by a
dysfunctional upbringing including having been allegedly molested
by a neighbor as a child, three failed marriages, flashbacks to
traumatic experiences while serving in Vietnam[14] and his claimed
inability to work after cardiac surgery in 2001.[15]  Tr. 694-704.
He was evaluated, diagnosed with major depression with psychotic

13.  Community Health and Counseling Services has several offices
in Maine.  We are unable to discern from the administrative
record at which office Oldenburgh sought treatment.

14.  The administrative record indicates that Oldenburgh served
in the Army from 1972 to 1976 and that he was dishonorably
discharged.  He was wounded in Vietnam apparently after being
stationed there 28 days.  Tr. 65 and 696.

15.  Oldenburgh has coronary artery disease and underwent
coronary artery bypass surgery in November, 2001. In January
2005, Oldenburgh underwent a catherization of the heart because a
stress test suggested that he had "moderate anterior ischemia
with an ejection fraction of 47%."  Tr. 656-657.  The
catherization revealed the three vessel coronary artery disease
which was corrected by bypass surgery in 2001.  Tr. 661.  The
four bypass grafts were patent, that is unoccluded, Oldenburgh
had "[n]ormal left ventricular function with an ejection fraction
of 64%" and there was no mitral valve regurgitation. Tr. 655 and
661.  Furthermore, it was "felt that [the] stress test was a
false positive reading."  Tr. 657.  The ejection fraction is the
percentage of blood pumped out of the left ventricle of the heart
in a single beat.  A normal left ventricle ejection fraction is
55% to 70%.  http://www.mayoclinic.com/health/ ejection-fraction
/AN00360 (visited March 25, 2009).

features, determined to have a Global Assessment of Functioning (GAF) of 40,[16] prescribed medication, and referred for counseling.

Oldenburgh began counseling services with Katherine Page in December, 2004.  She diagnosed him as having panic disorder with agoraphobia and other mental health conditions. Tr. 669-682 and 723.  Ms. Page provided weekly individual psychotherapy to Oldenburgh until he moved in March, 2005, to Waterville, Maine. Tr. 669.

Oldenburgh continued his mental health care at Kennebec Valley MHC after he moved to Waterville.  Tr. 683, 685-687, 729-739.  Treatment records indicate Oldenburgh reported thoughts of anger, frustration, and a desire that God take him.  Tr. 729.  His providers found his GAF ranged between 45 and 50[17] during the time they treated him through February, 2006.  Tr. 731, 735 and 738. He was treated with medications and counseling.  Tr. 729-735 and 738-739.  Two of the providers, including a psychiatrist, Robert Anderson, M.D., who saw Oldenburgh once, reported in March 2006 that Oldenburgh was markedly limited in performing multiple work-

---

16.  The GAF score allows a clinician to indicate his judgment of a person's psychological, social and occupational functioning, in order to assess the person's mental health illness.  *Diagnostic and Statistical Manual of Mental Disorders* 3-32 (4th ed. 1994). A GAF of 40 represents "some impairment in reality testing or communication" such that the patient is unable to work, avoids friends and neglects family.  Id.

17.  A GAF score of 41 to 50 represents "serious" symptoms, including the inability to keep a job.

related functions because of his mental health problems.  Tr. 736-737.

The administrative law judge did not address the significance of the GAF scores in his decision.  Furthermore, we are not satisfied that he gave an adequate explanation for rejecting Dr. Anderson's opinion relating to Oldenburgh's  work-related functional limitation.

Finally, the administrative law judge did not address a third-party report of Oldenburgh's functional limitations.   A friend of Oldenburgh, Deborah Stackpole, provided a report in May of 2004 at the Commissioner's request.  In the statement, Ms. Stackpole, who saw Oldenburgh on a regular basis from November of 2003, reported that Oldenburgh was in pain, needs help getting dressed, requires reminders to take medications, has vision difficulties, needs encouragement to perform activities, does not go out often, has limitations on his physical abilities, must use the bathroom often, and has difficulty concentrating and getting along with others.  Tr. 165-174.   Although the report of Ms. Stackpole is not relevant to Oldenburgh's claim for disability insurance benefits because she did not have contact with him on or before his date last insured, her report is relevant to Oldenburgh's claim for supplemental security income benefits. Consequently, the administrative law judge should have addressed it in his decision.

The decision of the Commissioner is not supported by substantial evidence.  Consequently, the decision of the Commissioner denying Oldenburgh social security benefits will be vacated and the case remanded to the Commissioner for a new hearing.

NOW, THEREFORE, IT IS ORDERED THAT:

1.  The Clerk of Court shall enter judgment in favor of Douglas A. Oldenburgh and against the Commissioner of Social Security as set forth in the following paragraph.

2.  The decision of the Commissioner of Social Security denying Douglas A. Oldenburgh social security disability insurance benefits and supplemental security income benefits is vacated and the case remanded to the Commissioner of Social Security to:

2.1 Fully develop the record, conduct a new administrative hearing and appropriately evaluate the medical and non-medical evidence and issue a new decision in accordance with the background of this order.

3.  The Clerk of Court shall close this case.


s/Malcolm Muir
MUIR
United States District Judge


MM:gs